1  ROBBINS UMEDA LLP
   BRIAN J. ROBBINS (190264)
2  brobbins@robbinsumeda.com
   FELIPE J. ARROYO (163803)
3  farroyo@robbinsumeda.com
   SHANE P. SANDERS (237146)
4  ssanders@robbinsumeda.com
   KEVIN S. KIM (275200)
5  kkim@robbinsumeda.com
   600 B Street, Suite 1900
6  San Diego, CA 92101
   Telephone: (619) 525-3990
7  Facsimile: (619) 525- 3991

8  Attorneys for Plaintiff

9  [Additional counsel appear on signature page]

10

11                  UNITED STATES DISTRICT COURT

12                  CENTRAL DISTRICT OF CALIFORNIA

13                       SOUTHERN DIVISION

14  JAMES TRIPOLI, Derivatively on        )  Case No.:
    Behalf of QUESTCOR                    )
15  PHARMACEUTICALS, INC.,                )     SACV12 - 01759 AG (MLGx)
                                          )
16                    Plaintiff,          )
                                          )  VERIFIED SHAREHOLDER
        v.                                )  DERIVATIVE COMPLAINT FOR
17                                        )  BREACH OF FIDUCIARY DUTY,
    DON M. BAILEY, MICHAEL H.             )  WASTE OF CORPORATE ASSETS,
18  MULROY, STEPHEN L. CARTT,             )  AND UNJUST ENRICHMENT
    DAVID YOUNG, DAVID J.                 )
19  MEDEIROS, MITCHELL J. BLUTT,          )
    VIRGIL D. THOMPSON, STEPHEN           )
20  C. FARRELL, NEAL C.                   )
    BRADSHER, LOUIS E.                    )
21  SILVERMAN, and SCOTT M.               )
    WHITCUP,                              )
22                                        )
                      Defendants,         )
23        -and-                           )
                                          )
24  QUESTCOR PHARMACEUTICALS,             )
    INC., a California corporation,       )
25                                        )
                  Nominal Defendant.      )
26  _____ )  **DEMAND FOR JURY TRIAL**

27

28

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought on behalf of nominal defendant Questcor Pharmaceuticals, Inc. ("Questcor" or the "Company") against certain of its officers and directors seeking to remedy defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment, that have caused and will continue to cause substantial monetary losses to Questcor and other damages, such as to its reputation and goodwill.

2.      Questcor describes itself as a "biopharmaceutical company focused on the treatment of patients with serious, difficult-to-treat autoimmune and inflammatory disorders." Questcor essentially relies on one drug for its revenue, H.P. Acthar® Gel ("Acthar"). Although approved for the treatment of nineteen indications, Acthar is a first-line treatment[1] only for infantile spasms, a rare, terrible seizure disorder that affects approximately 1,500 babies a year in the United States.

3.      This action concerns breaches of fiduciary duty by certain of the Company's officers and directors, which culminated in them unloading hundreds of millions of dollars' worth of their personally held Questcor stock at artificially inflated prices on an unsuspecting public. As explained in greater detail below, certain of the Individual Defendants (as defined herein) drove up the stock price of Questcor by making improper statements about the purported broad effectiveness of Acthar, the Company's primary product. In particular, defendants claimed that the Company's rapidly increasing revenues was a sign of medical acceptance and market penetration of Acthar for its nineteen approved indications, including multiple sclerosis ("MS") and nephrotic syndrome ("NS"). In truth, the prescription of Acthar for these indications was due to the Company's improper

---

[1] First-line treatment refers to the initial or first treatment recommended for a disease or illness.

- 1 -

sales and marketing campaign for Achthar, which pushed the drug despite the fact that it was not the least expensive treatment and/or the most effective treatment.[2] This boost in Acthar's prescriptions and the Company's revenues was only temporary, however, because, as defendants knew, insurance companies would stop reimbursing for the use of Achtar for treatment of indications that it was not the most effective alternative.

4.      Defendants used their knowledge of the Company's true business health and prospects to benefit themselves.  While causing the Company to make improper statements that inflated its stock price, certain of the Company's officers and directors, including seven of the eleven Individual Defendants, were selling over *$107 million* worth of their stock in a massive and coordinated fashion. Further, at the same time as these defendants were massively selling off their stock, they caused the Company to repurchase $185 million of its own stock on the basis that it was undervalued.

5.      This scheme began to unravel on September 14, 2012.  On that day, Aetna Inc. ("Aetna"), one of the nation's largest insurers, issued a Clinical Policy Bulletin that severely limited reimbursement for Acthar and contained damaging conclusions regarding the drug's efficacy.  According to the Clinical Policy Bulletin, Aetna had engaged in a review of the nineteen indications for which the U.S. Food and Drug Administration ("FDA") had approved Acthar, and concluded that *clinical research supported only one of the nineteen indications*.  Aetna reported that studies suggested that the drug is only "medically necessary" for infantile spasms, and not for other indications, such as MS and NS, that are treated with steroids.

---

[2] Insurance companies, on which pharmaceutical companies like Questcor rely upon for reimbursements, focus on whether a drug is the least expensive treatment and/or the most effective alternative to determine whether to consider a drug "medically necessary" and reimbursable.

6. Then, on September 24, 2012, the Company announced that the U.S. government was investigating its sales and marketing tactics. While the Company did not provide specifics with respect to the investigation, the investigation is likely into whether the Company was paying kickbacks to doctors.

7. Upon disclosure of the Company's true business health and limited financial outlook, Questcor's market capitalization plunged by almost 67%, erasing more than $2.3 billion in value. As a direct result of the Individual Defendants' wrongdoing, the Company is now the subject of multiple securities class actions ("Securities Class Actions") filed in the United States District Court for the Central District of California on behalf of investors who purchased Questcor's shares. In addition to the liability Questcor faces as a result of the U.S. government investigation into its sales and marketing practices, these Securities Class Actions pose the risk of billions of dollars in damages to the Company.

8. Plaintiff brings this action against the Individual Defendants to repair the harm that they caused the Company and seeks disgorgement to the Company of unlawful insider trading proceeds.

**JURISDICTION AND VENUE**

9. This Court has jurisdiction in this case over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Questcor maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Questcor, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**THE PARTIES**

**Plaintiff**

12.     Plaintiff James Tripoli is a shareholder of Questcor and has continuously held stock since August 2008.  Plaintiff is a citizen of Maryland.

**Nominal Defendant**

13.     Nominal Defendant Questcor is a California corporation with its headquarters and principle executive offices located at 1300 North Kellogg Drive, Suite D, Anaheim, California.  Thus, Questcor is a citizen of California.  Questcor is a biopharmaceutical company that primarily relies on revenues associated with the sales of a drug called Acthar.[2]  Questcor acquired the rights to Acthar from a company called Aventis Pharmaceutical Products, Inc. in 2001 for $100,000.  In 2003, Questcor obtained "orphan drug" status for Acthar for the treatment of infantile spasms, a rare disorder that causes spasms in infants and affects approximately one of every 3,500 live births.  The FDA grants orphan drug status to a drug that treats a disease affecting fewer than 200,000 people. Orphan drug

---

[2] Questcor has a second product, Doral® (quazepam) ("Doral"), which is indicated for the treatment of insomnia. Questcor describes its sales of Doral as "immaterial."

- 4 -

status for an approved indication provides a company with seven years of marketing exclusivity, as well as tax incentives.  In 2006, Questcor applied for approval to treat infantile spasms with Acthar.   In August 2007, while the Company's application with the FDA was pending, Questcor raised the list price of Acthar from $1,600 per vial to over $23,000 per vial – an instant increase of well over 2,000%.   In October 2010, the FDA approved Acthar as a treatment for infantile spasms.

**Defendants**

14.     Defendant Don M. Bailey ("Bailey") is Questcor's President and Chief Executive Officer ("CEO") and has been since November 2007 and a director and has been since May 2006.  Bailey is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act").   Bailey knowingly, recklessly, or with gross negligence: (i) made improper statements in the Company's press releases and public filings concerning the Company's business prospects, including, but not limited to, the effectiveness of and potential market growth for Acthar; (ii) caused Questcor to repurchase Company shares, and failed to halt the repurchases of shares, while Questcor's share price was artificially inflated as a result of improper statements regarding Questcor's business prospects; and (iii) failed to ensure that reliable systems of financial controls and reporting were in place at the Company. While in possession of material, non-public information concerning Questcor's true business health, Bailey sold 440,000 shares of his stock for $17,718,533.36 in proceeds.  Questcor paid Bailey the following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|---------------|----------------------------------------|-------|
| 2011 | $584,875 | $2,628,815 | $1,332,540 | $4,546,230 |

Bailey is a citizen of California.

15.     Defendant Michael H. Mulroy ("Mulroy") is Questcor's Senior Vice President, Chief Financial Officer ("CFO"), General Counsel, and Corporate Secretary and has been since January 2011.  Mulroy is also Questcor's Principal Accounting Officer and has been since September 2011.  Mulroy is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Mulroy knowingly, recklessly, or with gross negligence: (i) made improper statements in the Company's press releases and public filings concerning the Company's business prospects, including, but not limited to, the effectiveness of and potential market growth for Acthar; and (ii) failed to ensure that reliable systems of financial controls and reporting were in place at the Company.  Questcor paid Mulroy the following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|---------------|----------------------------------------|-------|
| 2011 | $342,147 | $938,863 | $468,881 | $1,749,891 |

Mulroy is a citizen of California.

16.     Defendant Stephen L. Cartt ("Cartt") is Questcor's Chief Operating Officer and has been since February 2012.  Cartt was also Questcor's Chief Business Officer from February 2010 to February 2012 and an Executive Vice President from March 2005 to February 2012.  Cartt is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Cartt knowingly, recklessly, or with gross negligence: (i) made improper statements in the Company's press releases and public filings concerning the Company's business prospects, including, but not limited to, the effectiveness of and potential market growth for Acthar; and (ii) failed to ensure that reliable systems of financial controls and reporting were in place at the Company.  While in possession of material, non-public information concerning Questcor's true

business health, Cartt sold 505,509 shares of his stock for $16,215,281.15 in proceeds.  Questcor paid Cartt the following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|---------------|----------------------------------------|-------|
| 2011 | $389,917 | $1,126,635 | $781,756 | $2,298,308 |

Cartt is a citizen of California.

17.     Defendant David Young ("Young") is Questcor's Chief Scientific Officer and has been since October 2009.  Young is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Young knowingly, recklessly, or with gross negligence: (i) made improper statements in the Company's press releases and public filings concerning the Company's business prospects, including, but not limited to, the effectiveness of and potential market growth for Acthar; and (ii) failed to ensure that reliable systems of financial controls and reporting were in place at the Company.  While in possession of material, non-public information concerning Questcor's true business health, Young sold 175,124 shares of his stock for $7,047,323.60 in proceeds.  Questcor paid Young the following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|---------------|----------------------------------------|-------|
| 2011 | $424,320 | $751,090 | $773,394 | $1,948,804 |

Young is a citizen of California.

18.     Defendant David J. Medeiros ("Medeiros") is Questcor's Executive Vice President and Chief Technical Officer and has been since February 2012.  Medeiros was also Questcor's Senior Vice President, Pharmaceutical Operations from February 2007 to February 2012 and Vice President, Manufacturing from June 2003 to February 2007.  Medeiros knowingly, recklessly, or with gross negligence failed to ensure that reliable systems of financial controls and reporting were in place at the Company.  While in possession of material, non-public information concerning Questcor's true business health, Medeiros sold 1,063,363

shares of his stock for $35,378,781.87 in proceeds.   Questcor paid Medeiros the following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|---------------|----------------------------------------|-------|
| 2011 | $362,066 | $375,545 | $494,945 | $1,232,556 |

Medeiros is a citizen of California.

19.   Defendant Mitchell J. Blutt ("Blutt") is a Questcor director and has been since July 2010.   Blutt is also a member of Questcor's Audit Committee and has been since at least April 2011.   Blutt knowingly or recklessly: (i) reviewed and approved improper statements in the Company's press releases and public filings concerning the Company's business prospects, including, but not limited to, the effectiveness of and potential market growth for Acthar; (ii) caused Questcor to repurchase Company shares, and failed to halt the repurchases of shares, while Questcor's share price was artificially inflated as a result of improper statements regarding Questcor's business prospects; and (iii) failed to ensure that reliable systems of financial controls and reporting were in place at the Company.   While in possession of material, non-public information concerning Questcor's true business health, Blutt sold 706,255 shares of his stock for $25,162,724.77 in proceeds.   Questcor paid Blutt the following compensation as a director:

| Year | Fees Paid in Cash | Option Awards | Total |
|------|-------------------|---------------|-------|
| 2011 | $57,500 | $194,235 | $251,735 |

Blutt is a citizen of New York.

20.   Defendant Virgil D. Thompson ("Thompson") is Questcor's Chairman of the Board and has been since July 2007 and a director and has been since January 1996.   Thompson is a member of Questcor's Audit Committee and has been since at least April 2011.   In addition, Thompson is a member of the Compliance Committee and has been since February 2012.   Thompson knowingly or recklessly: (i) reviewed and approved improper statements in the Company's

1  press releases and public filings concerning the Company's business prospects,

2  including, but not limited to, the effectiveness of and potential market growth for

3  Acthar; (ii) caused Questcor to repurchase Company shares, and failed to halt the

4  repurchases of shares, while Questcor's share price was artificially inflated as a

5  result of improper statements regarding Questcor's business prospects; and (iii)

6  failed to ensure that reliable systems of financial controls and reporting were in

7  place at the Company.   While in possession of material, non-public information

8  concerning Questcor's true business health, Thompson sold 167,500 shares of his

9  stock for $3,413,650 in proceeds.   Questcor paid Thompson the following

10  compensation as a director:

11

| Year | Fees Paid in Cash | Option Awards | Total |
|------|-------------------|---------------|-------|
| 2011 | $75,000 | $194,235 | $269,235 |

12

13  Thompson is a citizen of California.

14       21.    Defendant Stephen C. Farrell ("Farrell") is a Questcor director and has

15  been since November 2007.    Farrell is also Chairman of Questcor's Audit

16  Committee and has been since at least April 2011 and a member of the Compliance

17  Committee and has been since February 2012.   Farrell knowingly or recklessly: (i)

18  reviewed and approved improper statements in the Company's press releases and

19  public filings concerning the Company's business prospects, including, but not

20  limited to, the effectiveness of and potential market growth for Acthar; (ii) caused

21  Questcor to repurchase Company shares, and failed to halt the repurchases of

22  shares, while Questcor's share price was artificially inflated as a result of improper

23  statements regarding Questcor's business prospects; and (iii) failed to ensure that

24  reliable systems of financial controls and reporting were in place at the Company.

25  While in possession of material, non-public information concerning Questcor's true

26  business health, Farrell sold 55,000 shares of his stock for $2,353,622.64 in

27  proceeds. Questcor paid Farrell the following compensation as a director:

28

| Year | Fees Paid in Cash | Option Awards | Total |
|------|-------------------|---------------|-------|
| 2011 | $65,000 | $252,506 | $317,506 |

Farrell is a citizen of Massachusetts.

22.    Defendant Neal C. Bradsher ("Bradsher") is a Questcor director and has been since at March 2004.   Bradsher knowingly or recklessly: (i) caused Questcor to repurchase Company shares, and failed to halt the repurchases of shares, while Questcor's share price was artificially inflated as a result of improper statements regarding Questcor's business prospects; and (ii) failed to ensure that reliable systems of financial controls and reporting were in place at the Company. Questcor paid Bradsher the following compensation as a director:

| Year | Fees Paid in Cash | Option Awards | Total |
|------|-------------------|---------------|-------|
| 2011 | $52,500 | $252,506 | $305,006 |

Bradsher is a citizen of New York.

23.    Defendant Louis E. Silverman ("Silverman") is a Questcor director and has been since November 2009.  Silverman knowingly or recklessly: (i) caused Questcor to repurchase Company shares, and failed to halt the repurchases of shares, while Questcor's share price was artificially inflated as a result of improper statements regarding Questcor's business prospects; and (ii) failed to ensure that reliable systems of financial controls and reporting were in place at the Company. Questcor paid Silverman the following compensation as a director:

| Year | Fees Paid in Cash | Option Awards | Total |
|------|-------------------|---------------|-------|
| 2011 | $60,000 | $252,506 | $312,506 |

Silverman is a citizen of California.

24.    Defendant Scott M. Whitcup ("Whitcup") is a Questcor director and has been since February 2012.   Whitcup is also Chairman of Questcor's Compliance Committee and has been since February 2012.  Whitcup knowingly or recklessly: (i) caused Questcor to repurchase Company shares, and failed to halt the repurchases of shares, while Questcor's share price was artificially inflated as a

result of improper statements regarding Questcor's business prospects; and (ii) failed to ensure that reliable systems of financial controls and reporting were in place at the Company. Whitcup is a citizen of California.

25. The defendants identified in ¶¶14-18 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶14, 19-24 are referred to herein as the "Director Defendants." The defendants identified in ¶¶19-21 are referred to herein as the "Audit Committee Defendants." The defendants identified in ¶¶20-21, 24 are referred to herein as the "Compliance Committee Defendants." The defendants identified in ¶¶14, 16-21 are referred to herein as the "Insider Selling Defendants." Collectively, the defendants identified in ¶¶14-24 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

26. By reason of their positions as officers, directors, and/or fiduciaries of Questcor and because of their ability to control the business and corporate affairs of Questcor, the Individual Defendants owed and owe Questcor and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Questcor in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Questcor and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

27. Each officer and director of the Company owes to Questcor and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held corporation, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard

1   to the Company's operations, performance, management, projections, and forecasts

2   so that the market price of the Company's stock would be based on truthful and

3   accurate information.

4   **Additional Duties of the Audit Committee Defendants**

5       28.   In addition to these duties, under the Company's Audit Committee

6   Charter in effect since at least April 2009, Audit Committee Defendants Blutt,

7   Farrell, and Thompson owed specific duties to Questcor to review and approve the

8   Company's earnings press releases, guidance, and quarterly and annual financial

9   statements.  Moreover, the Audit Committee Defendants were specially tasked

10   with assisting the Board with its oversight responsibilities regarding the Company's

11   compliance with legal and regulatory requirements.

12   **Additional Duties of the Compliance Committee Defendants**

13       29.   Under the Company's Compliance Committee Charter in effect since

14   at least March 2012, Compliance Committee Defendants Farrell, Whitcup, and

15   Thompson owed specific duties to Questcor to monitor the Company's compliance

16   with "significant healthcare related" and "regulatory issues."  Moreover, the

17   Compliance Committee Defendants were specifically tasked with reviewing the

18   status of the Company's "***compliance with U.S. pharmaceutical product***

19   ***promotional rules and regulations***, including with respect to 'off-label' and other

20   product promotional activities, unapproved product uses, fair balance, product

21   safety claims, and ***product superiority or efficacy claims***; product manufacturing

22   quality control; ***clinical studies quality control***; and required reporting to the Food

23   and Drug Administration ("FDA")."

24   **Control, Access, and Authority**

25       30.   The Individual Defendants, because of their positions of control and

26   authority as officers and/or directors of Questcor, were able to and did, directly

27   and/or indirectly, exercise control over the wrongful acts complained of herein, as

28   well as the contents of the various public statements issued by the Company.

31.   Because of their advisory, executive, managerial, and directorial positions with Questcor, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and growth prospects of Questcor.   While in possession of this material, non-public information, the Individual Defendants made improper representations concerning the Company's business prospects, including, but not limited to, the effectiveness of and potential market growth for Acthar.

32.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Questcor, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

33.   To discharge their duties, the officers and directors of Questcor were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Questcor were required to, among other things:

(a)   refrain from acting upon material, inside corporate information to benefit themselves;

(b)   properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(c)   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(d)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

1        (e)    ensure that the Company was operated in a diligent, honest, and

2  prudent manner in compliance with all applicable laws, rules, and regulations; and

3        (f)    remain informed as to how Questcor conducted its operations,

4  and, upon receipt of notice or information of imprudent or unsound conditions or

5  practices, make reasonable inquiry in connection therewith, and take steps to

6  correct such conditions or practices and make such disclosures as necessary to

7  comply with securities laws.

8                             **BREACHES OF DUTIES**

9      34.    Each Individual Defendant, by virtue of his position as a director

10  and/or officer, owed to the Company and to its shareholders the fiduciary duty of

11  loyalty and good faith and the exercise of due care and diligence in the

12  management and administration of the affairs of the Company, as well as in the use

13  and preservation of its property and assets.   The conduct of the Individual

14  Defendants complained of herein involves a knowing and culpable violation of

15  their obligations as officers and directors of Questcor, the absence of good faith on

16  their part, and a reckless disregard for their duties to the Company and its

17  shareholders that the Individual Defendants were aware or should have been aware

18  posed a risk of serious injury to the Company.   The conduct of the Individual

19  Defendants who were also officers and/or directors of the Company have been

20  ratified by the remaining Individual Defendants who collectively comprised all of

21  Questcor's Board.

22      35.    The Individual Defendants breached their duty of loyalty and good

23  faith by allowing defendants to cause, or by themselves causing, the Company to

24  issue improper statements about Acthar and by misrepresenting the Company's

25  financial results and prospects.   The Individual Defendants also failed to prevent

26  the other Individual Defendants from taking such illegal actions.   As a result of

27  defendants' illegal actions and course of conduct, Questcor is now the subject of a

28  U.S. government investigation into its promotional practices and multiple class

1   action lawsuits that allege violations of securities laws.  As a result, Questcor has

2   expended, and will continue to expend, significant sums of money.

3                             **OVERVIEW**

4       36.    Acthar is used as a first-line treatment only for infantile spasms.

5   Despite this, defendants caused the Company to embark on an aggressive

6   campaign to transform its business model by expanding the use of Acthar for

7   indications where, although it was approved, it was not a medically necessary use.

8   The Company commercialized Acthar for treating MS in 2007, and NS in early

9   2011, and announced plans to commercialize Acthar in the treatment of

10   rheumatology-related indications in June 2012.  Defendants caused the Company

11   to pursue this marketing campaign without the benefit of clinical studies showing

12   the efficacy of Acthar in comparison with the preferred steroid treatments.

13       37.    As a result of this dramatic shift in business strategy, Questcor has

14   seen its net sales skyrocket from $8.4 million in 2005, to $49.8 million in 2007, to

15   $218.2 million in 2011.  Most of this growth was attributable to increased usage of

16   Acthar as a second-line treatment, with infantile spasms currently accounting for

17   only 6%-10% of the Company's revenues.

18       38.    While successful in the short-term, this strategy was doomed to failure

19   as defendants were well aware that insurance companies would ultimately stop

20   reimbursing for the use of Acthar once they learned that there are other less

21   expensive and/or more effective alternatives for all the indications for which

22   Acthar is approved, except infantile spasms.  Without reimbursements from

23   insurers, sales of Acthar would be crippled.  Despite the fact that the defendants

24   operated an unsustainable business model that desperately relied on the improper

25   marketing of Acthar for indications outside of infantile spasms, they continued to

26   disseminate improper statements touting the Company's financial results and

27   business prospects.

28

**IMPROPER STATEMENTS**

39.    The Individual Defendants' improper statements began on April 26, 2011.  On that date, Questcor issued a press release announcing its first quarter 2011 financial results.  The Company reported net income of $11.2 million, or $0.17 diluted earnings per share ("EPS"), and net sales of $36.8 million for the first quarter of 2011.  In this press release, defendant Bailey touted the efficacy of Acthar for treating MS and NS, and the effect this expansion of Acthar would have on the Company's business prospects.  The press release stated in part:

> "Our strategy to expand the sales force is clearly paying off," said Don M. Bailey, President and CEO of Questcor.  "Paid MS prescriptions are up sharply from last quarter. March was a particularly strong month and this momentum has continued so far in April. *We believe that Acthar is filling an increasingly important role in the treatment of exacerbations associated with MS and, looking forward, we expect to continue to grow sales in this important therapeutic area*."
>
> Mr. Bailey added, "We are also encouraged by the early positive results from our small, dedicated nephrology sales team, which initiated selling efforts at the beginning of March. *The number of nephrologists who are using Acthar to treat patients with nephrotic syndrome is increasing*."

40.    After issuing its first quarter 2011 financial results on April 26, 2011, Questcor hosted a conference call for analysts, media representatives, and investors.  During the call, defendants reiterated the record financial results reported in the Company's press release and defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey and Cartt discussed the Company's purported success due to the expansion of Acthar in treating MS and NS, stating in part:

[BAILEY:]  In summary, we are off to a very good start this year as we continue to execute our straightforward strategy to sell more Acthar.  *Our decision to expand the MS sales force is clearly paying off*.  Also, *our nephrotic syndrome sales force is having some early success*.

\*   \*   \*

*We believe this MS sales performance reflects the strong, underlying demand for Acthar*.  This growth in demand is being driven by the increasing productivity of our expanded sales force.  We believe net sales in the MS market are now about 60% of total Acthar net sales.

\*   \*   \*

[CARTT:]  *Our expanded promotional activities directed to neurologists generated significant growth in Acthar prescriptions for MS during the first quarter.  During the quarter we shipped a record 508 paid Acthar prescriptions for the treatment of MS relapses*.  This was an increase of 120% over the year ago period and 44% over the previous quarter.  We believe this performance is a strong signal that the sales force expansion has gained traction in the MS market at a faster rate than we expected.

41.    On July 26, 2011, Questcor issued a press release announcing its second quarter 2011 financial results.  The Company reported net income of $13.9 million, or $0.21 diluted EPS, and net sales of $46 million for the second quarter of 2011.   In this press release, defendant Bailey touted the Company's "terrific quarter," crediting "expanding the use of Acthar in the treatment of MS exacerbations" for the "record second quarter financial performance."  The release stated in part:

"Clearly, Questcor had a *terrific quarter*," said Don M. Bailey, President and CEO of Questcor.  "*Our focus on expanding the use of*

1    *Acthar in the treatment of MS exacerbations drove our record*
2    *second quarter financial performance*.  Importantly, in spite of the
3    rapid expansion in the use of Acthar for MS exacerbations, we believe
4    that the prescriber base can continue to grow.  Accordingly, growing
5    MS sales remains our number one priority.  Also, following our early
6    success in NS, we are immediately and substantially expanding our
7    nephrology selling effort."

8    42.    After issuing its second quarter 2011 financial results on July 26,
9    2011, Questcor hosted a conference call for analysts, media representatives, and
10   investors.    During the call, defendants reiterated the record financial results
11   reported in the Company's press release and defendant Mulroy discussed the
12   Company's financial performance in depth.    Additionally, defendant Cartt
13   specifically discussed the alleged success of Acthar for the treatment of MS
14   relapses, and stated that he expects "continued growth during 2011 and into 2012."
15   Cartt represented as follows:

16   [CARTT:]  *During the quarter we shipped a record 751 paid Acthar*
17   *prescription for the treatment of MS relapses*. This was an increase
18   of 147% over the year-ago period, and 48% over the previous quarter.
19   We believe this performance is a strong signal that the sales force
20   continues to gain traction in the MS market at a faster rate than we
21   expected. *In addition to rapid growth, our trends at MS are all very*
22   *good and indicate that we are building momentum in this key*
23   *Acthar market*.

24                              *    *    *

25   So, let's summarize. *We are very pleased with the robust MS*
26   *prescription growth during the quarter and expect continued growth*
27   *during 2011 and into 2012* as a result of the continued sustained sales
28   call activity.  Our early prescription trends in nephrology are

1    surprisingly strong and we are quickly expanding our sales capability

2    in MS, which will result in a dramatic increase in the number of

3    nephrologists that we can call on at the end of the third quarter, just

4    about two months away.

5    43.    On October 25, 2011, Questcor issued a press release announcing its

6  third quarter 2011 financial results.  The Company reported net income of $22.9

7  million, or $0.35 diluted EPS, and net sales of $59.8 million for the third quarter of

8  2011.  Moreover, defendant Cartt discussed the Company's growing sales and

9  marketing efforts, which were the primary drivers of "expanded usage of Acthar."

10  The press release stated in part:

11    "Our 77 person Specialty Sales Force continues to drive expanded

12    usage of Acthar as second-line therapy for MS exacerbations, a key

13    Acthar market," commented Steve Cartt, Executive Vice President

14    and Chief Business Officer. "Furthermore, during the third quarter we

15    completed the expansion of our Nephrology Sales Force from 5 to 28

16    representatives, with all new personnel being fully trained and making

17    initial sales calls by October 1st.  Despite the inherent disruption

18    involved with this expansion, paid nephrotic syndrome *Acthar*

19    *prescriptions increased during the quarter.  September was a*

20    *particularly strong month for both MS and NS sales.*"

21    44.    After issuing its third quarter 2011 financial results on October 25,

22  2011, Questcor hosted a conference call for analysts, media representatives, and

23  investors.  During the call, defendants reiterated the record financial results

24  reported in the Company's press release and defendant Mulroy discussed the

25  Company's financial performance in depth.  Defendant Cartt further presented

26  statements on the conference call regarding Acthar's positive trends in the

27  Company's MS business, representing as follows:

28

1     [CARTT:] *[W]e shipped 886 paid Acthar prescription for the*

2     *treatment of MS relapses during the third quarter of 2011.This was*

3     *an increase of 174% over the year-ago period. In addition to strong*

4     *script growth, other positive trends in our MS business indicate that*

5     *we are building momentum in this key Acthar market*.

6     45.   On January 11, 2012, *TheStreetSweeper.org ("StreetSweeper")*, a

7  website noted for unearthing corporate fraud in public companies, announced that

8  it had initiated a short position in Questcor.  *StreetSweeper* further reported that it

9  intended to issue the first article in a two-part investigative series about Questcor's

10  marketing practices in the following week.  According to *StreetSweeper*:

11     *The first article raises serious questions about the aggressive*

12     *marketing practices that [Questcor] has used to generate explosive –*

13     *but potentially unsustainable – growth in prescriptions for its only*

14     *drug while the second story further examines QCOR's business*

15     *practices, while taking a hard look at the leaders who have struck it*

16     *rich as a result of the company's controversial growth strategy*.

17     46.   On January 11, 2012, Questcor issued a press release entitled

18  "Questcor Pharmaceuticals Issues Statement," which attempted to refute the claims

19  raised by *StreetSweeper* and defend the Company's business practices.  The press

20  release stated:

21     Questcor Pharmaceuticals, Inc. today announced it became aware that

22     an investor blog is preparing to issue a report regarding the

23     Company's marketing and business practices.  Questcor issued the

24     following statement:

25     *The Company believes that its marketing and business practices are*

26     *consistent with regulatory requirements and industry standard*

27     *practices*.  Questcor markets H.P. Acthar® Gel for the treatment of

28     acute exacerbations of multiple sclerosis (MS) in adults, the treatment

of nephrotic syndrome, and the treatment of infantile spasms in children under two years of age. The Company maintains a compliance program, which is led by an experienced compliance officer and includes the active participation of Questcor's executive management team. Questcor attributes its success to the ability of Acthar to potentially address the unmet medical need associated with MS exacerbations and nephrotic syndrome. ***The Company is committed to providing access to Acthar to patients who need it, and marketing Acthar in accordance with regulatory requirements and industry standard practices.*** Questcor plans to speak with the publication to discuss the Company and its marketing and business practices.

47. *StreetSweeper* issued the first article in its two-part investigative series about Questcor's business practices on January 24, 2012. The second article was released three days later on January 27, 2012. Both of these *StreetSweeper* articles shed light on the defendants' improper marketing practices relating to expanding the use of Acthar for treating indications outside of infantile spasms. Moreover the *StreetSweeper* articles highlighted the fact that defendants caused the Company to completely and utterly disregard "regulatory requirements and industry standard practices." The *StreetSweeper* articles even quoted an industry veteran who resigned from the Company as stating:

"***It was 'anything for a referral***.' I heard that multiple times. The attitude there was: 'We're small. We're under the radar. And ***until we get caught, we're going to do anything we want***.' That's why I left. They've got this cavalier attitude about one of the most highly regulated industries in the country."

48. After issuing its fourth quarter and full year 2011 financial results on February 22, 2012, Questcor hosted a conference call for analysts, media

- 21 -

1   representatives, and investors.  During the call, defendants Bailey refuted the

2   serious allegations raised in the *StreetSweeper* articles and portrayed the claims as

3   being made by a short seller.  Bailey stated, in part:

> 4   Before providing a little overall perspective on the value drivers for
>
> 5   Questcor, *I wanted to briefly address some of the rumors that we are*
>
> 6   *being told are being spread by members of the short selling*
>
> 7   *community*.
>
> 8
>
> 9   First was the rumor that we canceled the RBC conference due to bad
>
> 10   news we did not want to share. Actually, we canceled the RBC
>
> 11   conference because we were double-booked with the Citi conference.
>
> 12   We presented at the Leerink conference last week and will present
>
> 13   again next Monday, February 27, at the Citi conference. *The next*
>
> 14   *rumor was that Questcor was the subject or soon to become the*
>
> 15   *subject of one or more government investigations. In reality, we*
>
> 16   *have no knowledge of any government investigation*. We have not
>
> 17   been contacted by any government agency regarding an actual or
>
> 18   potential investigation. *Furthermore, our recent compliance review*
>
> 19   *found no violations of policy, guidance, or law*. The third rumor is
>
> 20   that our success is due to just a couple of docs writing Acthar scripts.
>
> 21   Actually, *as we continue to educate physicians on how Acthar works*
>
> 22   *to treat serious medical conditions, the number of physicians*
>
> 23   *prescribing Acthar continues to grow*. This number has more than
>
> 24   doubled year-over-year, results in almost 900 doctors writing almost
>
> 25   1,800 Acthar prescriptions in the fourth quarter.
>
> 26
>
> 27   This associated rumor is that only a few reps are making sales.
>
> 28   Actually all MS reps generate scripts and three-quarters of all Acthar

MS reps met or exceeded their goal in Q4. *We have also heard the rumor that insurance companies are stopping their coverage of Acthar for nephrotic syndrome. As Steve reported, coverage of Acthar for nephrotic syndrome continues to be above 85%*. And we are asked about the rumor that our accounts receivable is up because payers have stopped approving Acthar. Accounts receivable are up mainly because sales are up. The day after the 8-K with our Leerink Swann investor conference presentation was filed, $13 million in checks were received and cleared payment. Payers do not pay us directly, so insurance issues would not affect AR in any case. There have been other rumors as well, but in the interest of time, I will not attempt to cover all of them. I think you get the idea.

49.    Additionally, in that same February 22, 2012 conference call, defendant Bailey assured investors that the Company's business model would lead to sustainable growth:

[BAILEY:] As *we look ahead to 2012 and beyond, we believe we can sustainably grow our Business* due to three key factors. First, Acthar provides benefits to many difficult to treat patients not responding to other treatments. Second, our market penetration in terms of the total number of neurologists and nephrologists prescribing Acthar, while growing, remains relatively small. And third, we have assembled an excellent, experienced commercial team to pursue our growth plan. Our focus remains on helping patients with serious, difficult to treat medical conditions.

50.    After issuing its first quarter 2012 financial results on April 24, 2012, Questcor hosted a conference call for analysts, media representatives, and investors.  During the call, defendants reiterated the Company's record financial results and defendant Mulroy discussed the Company's financial performance in

depth.  Moreover, during the call, defendant Cartt touted the "continued strong coverage" by insurance for Acthar prescriptions used to treat NS, representing as follows:

> [CARTT:] *Insurance reimbursements for Acthar in nephrotic syndrome continues to be very good, with more than 85% of private insurance prescriptions covered. We attribute this continued strong coverage to the severity of the health outcome if nephrotic syndrome is not adequately treated, coupled with the fact that Acthar is indicated and approved in this condition,* and there are few other treatment options. Further supporting both coverage and prescribing activity is the ongoing flow of positive results coming from the various studies we are funding. In fact, data from one study at the University of Toronto, is being presented just this week at the Canadian nephrology society annual meeting. This particular study found that about two-thirds of patients with nephrotic syndrome due to idiopathic membranous nephropathy, had their proteinuria drop by 50% or more, due to Acthar treatment.

51.  On July 10, 2012, *CitronResearch.com* ("*Citron*") issued an in-depth research report regarding Questcor. *Citron* expanded on the *StreetSweeper* articles and further raised concerns about the Company's marketing strategy.  The report questioned whether there was credible scientific data to support Questcor's aggressive strategy to expand the use of Acthar for indications other than infantile spasms.  In addition, the research report analyzed the Company's marketing expenses and questioned how the drug was being marketed to doctors.  The *Citron* report further condemned Questcor for the lack of any meaningful research and development being engaged in by the biopharmaceutical company.  The report noted: "*Just the insider selling over the last year represents more cash than Questcor has spent on research and development over its entire lifespan.*"  The

1  research report was not only critical of the amount of insider selling over the past

2  year but it was also critical about its timing given the Company was buying back

3  large amounts of Company stock at the same time the insiders were selling their

4  shares.

5       52.    Despite the serious allegations raised in the *Citron* report, defendants

6  caused Questcor to ignore the claims and continue reporting the Company's record

7  financial results. As a result, Questcor's stock continued to be artificially inflated.

8       53.    On July 24, 2012, Questcor issued a press release announcing its

9  second quarter 2012 financial results. The Company reported net income of $41.5

10  million, or $0.65 diluted EPS, and net sales of $112.5 million for the second

11  quarter of 2012. Defendant Bailey touted the fact that the Company "surpassed

12  $100 million in quarterly net sales for the first time in [its] history." The release

13  stated in part:

14       "***In the second quarter, we surpassed $100 million in quarterly net***

15       ***sales for the first time in our history***," said Don M. Bailey, President

16       and CEO of Questcor. "Our strong financial results were driven by

17       increasing usage of Acthar among nephrologists and neurologists.

18       With the expansion of our Nephrology Sales Force now complete, the

19       expansion of our Neurology Sales Force nearing completion, and the

20       initial detailing effort of a small sales force in Rheumatology just

21       getting started, we are optimistic about the potential for Acthar to help

22       an increasing number of patients with serious, difficult-to-treat

23       autoimmune and inflammatory disorders."

24       54.    After issuing its second quarter 2012 financial results on July 24,

25  2012, Questcor hosted a conference call for analysts, media representatives, and

26  investors. During the call, defendants reiterated the record financial results

27  reported in the Company's press release and defendant Mulroy discussed the

28  Company's financial performance in depth. Additionally, during the call,

defendant Bailey touted the fact that the Company "doubled the number of shipped vials in the quarter, more than doubled net sales, and tripled earnings from the year ago quarter." Furthermore, defendant Cartt discussed the Company's expanded sales forces to market Acthar and the "continued excellent Acthar insurance coverage for MS relapse." Bailey and Cartt represented as follows:

> [BAILEY:] We made significant progress with our business in the last three months. Financial performance again improved. We almost ***doubled the number of shipped vials in the quarter, more than doubled net sales, and tripled earnings from the year-ago quarter***. Paid scripts increased for both nephrotic syndrome and MS. ***We expanded two sales forces and started building a third sales force in Rheumatology, using the same formula that worked so well with MS and nephrotic syndrome***. And, we also made good progress in both our science and compliance programs.

> * * *

> [CARTT:] Our year-over-year growth in MS paid scripts is due to positive patient outcomes, increasing awareness about how Acthar can help patients who are not fully benefiting from other therapies, ***continued excellent Acthar insurance coverage for MS relapse***, and the increasing productivity of our MS commercial team.

## REASONS THE STATEMENTS WERE IMPROPER

55. The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     Questcor lacked clinical evidence to support the use of Acthar for indications other than infantile spasms;

1         (b)    The defendants had caused Questcor to engage in improper

2 promotional practices in relation to the sale and use of Acthar in the treatment of

3 MS and NS; and

4         (c)    Questcor and its officers and/or directors lacked a reasonable

5 basis to make positive statements and projections about the Company or its

6 outlook, including statements about the effectiveness of, and/or potential market

7 growth for, Acthar in light of: (i) the lack of clinical data supporting the use of

8 Acthar for anything but the treatment of infantile spasms; and (ii) the Company's

9 improper, and possibly illegal, sales practices.

10                      **THE TRUTH IS REVEALED**

11     56.    On September 14, 2012, Aetna, one of the nation's largest insurers,

12 issued a Clinical Policy Bulletin concerning Acthar.  The Clinical Policy Bulletin

13 severely limited reimbursement for Acthar and contained damaging conclusions

14 regarding the drug's efficacy.  Indeed, according to the Clinical Policy Bulletin,

15 Aetna had engaged in a review of the nineteen indications for which the FDA had

16 approved Acthar, and concluded that *clinical research supported only one of the*

17 *nineteen indications*. Aetna reported that studies suggested that the drug is only

18 "medically necessary" for infantile spasms, and not for other indications, such as

19 MS and NS, that are treated with steroids.

20     57.    Cynthia Michener, an Aetna spokesperson, provided further

21 explanation regarding Aetna revising its position on Acthar.  She stated that "Our

22 previous position was that this was a last-resort treatment.... *We now state that it*

23 *is not medically necessary because there is no clinical evidence that the drug is*

24 *more effective than steroids*."

25     58.    Aetna's Clinical Policy Bulletin has major, negative financial

26 implications for Questcor because Aetna, like most other insurers, typically only

27 reimburses for drugs when they are deemed medically necessary.  This is

28 especially damaging to Questcor given that the Company's financial future, growth

prospects, and stock price were all predicated on the use of Acthar to treat diseases other than infantile spasms.

59.     The Clinical Policy Bulletin was disclosed in a September 19, 2012 follow-up report by *Citron* and, not surprisingly, the market's reaction was swift and brutal.   Questcor's stock plummeted $24.16 per share to close that day at $26.25 per share, a one-day decline of nearly 48% on high volume.

60.     The bad news did not, however, end with Aetna.   On September 24, 2012, Questcor announced in a Form 8-K filed with the U.S. Securities and Exchange Commission ("SEC") that the U.S. government had initiated an investigation into the Company's promotional practices.   On this news, Questcor's stock dropped $11.05 per share to close at $19.08 per share, a decline of 37% on high volume.

61.     While the Company did not provide specifics with respect to the U.S. government investigation, some analysts speculated that the Company was paying kickbacks to doctors.   As stated by Roth Capital Partners in an analyst report published on September 24, 2012:

> Although the company is still learning the details of the full nature of the investigation, *we believe the possible scope, based on our prior experience, could potentially be 1) off-label (or false claim) marketing or 2) kick-backs taking place during the process*.

That same day, ThinkEquity LLC stated the following in an analyst report:

> Given the 19 labeled indications we would be surprised to see off-label marketing for this drug. *Is it possible that QCOR has been providing a too-high honorarium to high prescribing doctors which has the appearance of "paying for Rx's"?*

### THE IMPROPER REPURCHASES

62.     While the Individual Defendants made improper statements and failed to disclose material facts that had the effect of maintaining the Company stock

1  artificially inflated, defendants Bailey, Blutt, Thompson, Farrell, Bradsher,

2  Silverman, and Whitcup authorized and implemented multiple repurchases of the

3  Company's stock at these artificially inflated rates.  Despite knowing or recklessly

4  disregarding the fact that the value of the Company was inflated due to the

5  improper statements concerning the Company's business prospects, including, but

6  not limited to, the effectiveness of and potential market growth for Acthar, these

7  defendants either directed or permitted the Company to materially overpay for its

8  own stock through the repurchases detailed herein.[3]

9      63.    From March 2012 to June 2012, defendants Bailey, Blutt, Thompson,

10  Farrell, Bradsher, Silverman, and Whitcup caused the Company to repurchase

11  approximately 4,528,354 shares of its stock at a staggering aggregate cost to the

12  Company of over $185 million.  The purchases of the Company's stock were at

13  artificially inflated prices as a result of the improper statements, press releases, and

14  filings with the SEC that failed to disclose material information regarding the

15  Company business prospects, including, but not limited to the effectiveness of and

16  potential market growth for Acthar.

17      64.    Despite defendants Bailey, Blutt, Thompson, Farrell, Bradsher,

18  Silverman, and Whitcup's knowledge of the true facts about the improper

19  marketing of Acthar and the Company's resulting temporary and unsustainable

20  financial success, they did not halt the Company's purchases and continued to

21

22  _____

23  [3] On February 29, 2008, Robert J. Rubin and defendants Bailey, Bradsher, Farrell, Thompson, and Young approved a stock repurchase plan that provided for the

24  repurchase of up to seven million shares of Questcor common stock.  On May 29, 2009, defendants Bailey, Bradsher, Farrell, Thompson, and Young increased the

25  stock repurchase plan by an additional 6.5 million shares.  On May 9, 2012,

26  defendants Bailey, Blutt, Bradsher, Farrell, Silverman, Thompson, and Whitcup increased the stock repurchase plan by an additional five million shares.  This

27  stock repurchase program did not have an expiration date and could have been

28  limited or terminated at any time by the Board without prior notice.

1  allow the Company to purchase shares at artificially inflated prices.  Bailey, Blutt,

2  Thompson, Farrell, Bradsher, Silverman, and Whitcup's decision was not the

3  product of a valid business judgment.

4      65.    Under defendants Bailey, Blutt, Thompson, Farrell, Bradsher,

5  Silverman, and Whitcup's purview, the Company bought back its shares at a

6  weighted average price of $40.87.  Tellingly, the weighted average repurchase

7  price was over twice as high as Questcor's share price of $19.08 on September 24,

8  2012, when the truth about the defendants' unsustainable business model was

9  revealed.  The following chart illustrates the average prices paid for the Company's

10 common stock during the repurchase period:

| February 2008 Repurchase Program | Period | Shares Repurchased | Average Price Per Share | Approximate Aggregate Cost | Source | File Date |
|---|---|---|---|---|---|---|
| | No Expiration | | | | 8K | 3/4/2008 |
| | Apr-11 | - | - | - | 10Q | 10/27/2011 |
| | May-11 | - | - | - | 10Q | 10/27/2011 |
| | Jun-11 | - | - | - | 10Q | 10/27/2011 |
| | Jul-11 | - | - | - | 10Q | 10/27/2011 |
| | Aug-11 | - | - | - | 10Q | 10/27/2011 |
| | Sep-11 | - | - | - | 10Q | 10/27/2011 |
| | Oct-11 | - | - | - | 10K | 2/22/2012 |
| | Nov-11 | - | - | - | 10K | 2/22/2012 |
| | Dec-11 | - | - | - | 10K | 2/22/2012 |
| | Jan-12 | - | - | - | 10Q | 4/26/2012 |
| | Feb-12 | - | - | - | 10Q | 4/26/2012 |
| | Mar-12 | 798,285 | $36.31 | $28,985,728 | 10Q | 4/26/2012 |
| | Apr-12 | 914,500 | $43.77 | $40,027,665 | 10Q | 7/25/2012 |
| | May-12 | 2,751,080 | $41.25 | $113,482,050 | 10Q | 7/25/2012 |
| | Jun-12 | 64,489 | $40.25 | $2,595,682 | 10Q | 7/25/2012 |
| Total: | | 4,528,354 | | $185,091,126 | | |

24     66.    Because the price of Questcor's shares was artificially inflated by way

25 of the Individual Defendants' concealment and misrepresentations, the Company

26 materially overpaid for its own stock.  The stock purchases falsely signaled to

27 Questcor's shareholders and the public that the purchase of the Company's stock at

28 those prices was the best use of Questcor's cash.  Thus, defendants Bailey, Blutt,

1  Thompson, Farrell, Bradsher, Silverman, and Whitcup breached their fiduciary
2  duties and committed corporate waste by causing Questcor to purchase over $185
3  million of its own shares at artificially inflated prices.

4  **INSIDER SELLING**

5      67.    The Individual Defendants' knowledge of the true health of Questcor's
6  business prospects and the ticking time clock until they would no longer be able to
7  successfully market Acthar for indications other than infantile spasms is also
8  shown in certain Questcor officers' and directors' sales of personally-held stock.
9  At the same time that they were causing the Company to repurchase Questcor
10  stock at artificially inflated prices, the Insider Selling Defendants, Mederios, Blutt,
11  Bailey, Cartt, Young, Thompson, and Farrell, were privy to adverse, non-public
12  information which they exploited for their own benefit, to the exclusion of other
13  shareholders, by selling their Company stockholdings before the truth came to
14  light.  While continuously making or causing the Company to make improper
15  statements touting its business prospects, certain officers and directors sold
16  massive amounts of Company stock in order to capitalize on the Company's
17  inflated stock price that they had helped create.

18      68.    As Questcor's Executive Vice President and Chief Technical Officer,
19  defendant Medeiros was a member of the Company's management. He was privy
20  to material, non-public information about the limits to the effectiveness of, and
21  potential market growth for, Acthar. Medeiros engaged in insider trading activity
22  at a time when he knew adverse material, non-public information that would
23  directly affect the Company's bottom line.

24      69.    While in possession of this knowledge, defendant Medeiros sold
25  1,063,363 shares of his personally held Questcor stock for proceeds of
26  $35,378,781.87. Medeiros' sales are particularly suspicious given that his stock
27  sales during the period tainted by improper statements represented over 99% of his
28  holdings, as demonstrated by the chart below. Furthermore, Medeiros' sales are

- 31 -

also suspicious considering that he did not sell any of his stock in the same amount of time prior to the start of the wrongdoing detailed herein.

| | |
|---|---|
| Shares Sold During SP | 1,063,363 |
| Shares Remaining After Sales | 7,439 |
| Total Shares Before Sales | 1,070,802 |
| **Total Proceeds from Sales** | **$35,378,781.87** |
| **% of Total Ownership Sold During SP** | **99.31%** |

70.    As a director of Questcor, defendant Blutt was a member of the Company's Board.  He was privy to material, non-public information about the limits to the effectiveness of, and potential market growth for, Acthar.  Blutt engaged in insider trading activity at a time when he knew adverse material, non-public information that would directly affect the Company's bottom line.

71.    While in possession of this knowledge, defendant Blutt sold 706,255 shares of his personally held Questcor stock for proceeds of $25,162,724.77.  Blutt's sales are suspicious given that his stock sales during the period tainted by improper statements represented over 76% of his holdings, as demonstrated by the chart below.  Furthermore, Blutt's sales are also suspicious considering that he did not sell any of his stock in the same amount of time prior to the start of the wrongdoing detailed herein.

| | |
|---|---|
| Shares Sold During SP | 706,255 |
| Shares Remaining After Sales | 220,000 |
| Total Shares Before Sales | 926,255 |
| **Total Proceeds from Sales** | **$25,162,724.77** |
| **% of Total Ownership Sold During SP** | **76.25%** |

72.    As Questcor's CEO, President, and a director, defendant Bailey was a member of the Company's management and Board.  He was privy to material, non-public information about the limits to the effectiveness of, and potential market growth for, Acthar.  Bailey engaged in insider trading activity at a time when he knew adverse material, non-public information that would directly affect the Company's bottom line.

73. While in possession of this knowledge, defendant Bailey sold 440,000 shares of his personally held Questcor stock for proceeds of $17,718,533.35. Bailey's sales are suspicious given that his stock sales during the period tainted by improper statements represented almost 75% of his holdings as demonstrated by the chart below. Furthermore, Bailey's sales are also suspicious considering that he did not sell any of his stock in the same amount of time prior to the start of the wrongdoing detailed herein.

| Shares Sold During SP | 440,000 |
|---|---|
| Shares Remaining After Sales | 147,422 |
| Total Shares Before Sales | 587,422 |
| **Total Proceeds from Sales** | **$17,718,533.35** |
| **% of Total Ownership Sold During SP** | **74.90%** |

74. As Questcor's Chief Operating, Chief Business Officer, and an Executive Vice President, defendant Cartt was a member of the Company's management. He was privy to material, non-public information about the limits to the effectiveness of, and potential market growth for, Acthar. Cartt engaged in insider trading activity at a time when he knew adverse material, non-public information that would directly affect the Company's bottom line.

75. While in possession of this knowledge, defendant Cartt sold 505,509 shares of his personally held Questcor stock for proceeds of $16,215,281.15. Cartt's sales are suspicious given that his stock sales during the period tainted by improper statements represented over 86% of his holdings as demonstrated by the chart below. Furthermore, Cartt's sales are also suspicious considering that he did not sell any of his stock in the same amount of time prior to the start of the wrongdoing detailed herein.

| Shares Sold During SP | 505,509 |
|---|---|
| Shares Remaining After Sales | 78,198 |
| Total Shares Before Sales | 583,707 |
| **Total Proceeds from Sales** | **$16,215,281.15** |
| **% of Total Ownership Sold During SP** | **86.60%** |

76.   As Questcor's Chief Scientific Officer, defendant Young was a member of the Company's management.  He was privy to material, non-public information about the limits to the effectiveness of, and potential market growth for, Acthar.  Young engaged in insider trading activity at a time when he knew adverse material, non-public information that would directly affect the Company's bottom line.

77.   While in possession of this knowledge, defendant Young sold 175,124 shares of his personally held Questcor stock for proceeds of $7,047,323.60.  Young's sales are particularly suspicious given that his stock sales during the period tainted by improper statements represented over 92% of his holdings as demonstrated by the chart below:

| | |
|---|---|
| Shares Sold During SP | 175,124 |
| Shares Remaining After Sales | 13,903 |
| Total Shares Before Sales | 189,027 |
| **Total Proceeds from Sales** | **$7,047,323.60** |
| **% of Total Ownership Sold During SP** | **92.64%** |

78.   As a director of Questcor, defendant Thompson was a member of the Company's Board.  He was privy to material, non-public information about the limits to the effectiveness of, and potential market growth for, Acthar.  Thompson engaged in insider trading activity at a time when he knew adverse material, non-public information that would directly affect the Company's bottom line.

79.   While in possession of this knowledge, defendant Thompson sold 167,500 shares of his personally held Questcor stock for proceeds of $3,413,650.  Thompson's sales are particularly suspicious given that his stock sales during the period tainted by improper statements represented over 91% of his holdings as demonstrated by the chart below:

| | |
|---|---|
| Shares Sold During SP | 167,500 |
| Shares Remaining After Sales | 15,000 |
| Total Shares Before Sales | 182,500 |
| **Total Proceeds from Sales** | **$3,413,650.00** |
| **% of Total Ownership Sold During SP** | **91.78%** |

80.     As a director of Questcor, defendant Farrell was a member of the Company's Board.  He was privy to material, non-public information about the limits to the effectiveness of, and potential market growth for, Acthar.  Farrell engaged in insider trading activity at a time when he knew adverse material, non-public information that would directly affect the Company's bottom line.

81.     While in possession of this knowledge, defendant Farrell sold 55,000 shares of his personally held Questcor stock for proceeds of $2,353,622.64.  Farrell's sales are suspicious given that his stock sales during the period tainted by improper statements represented over 86% of his holdings as demonstrated by the chart below.  Furthermore, Farrell's sales are also suspicious considering that he did not sell any of his stock in the same amount of time prior to the start of the wrongdoing detailed herein.

| | |
|---|---|
| Shares Sold During SP | 55,000 |
| Shares Remaining After Sales | 8,750 |
| Total Shares Before Sales | 63,750 |
| **Total Proceeds from Sales** | **$2,353,622.64** |
| **% of Total Ownership Sold During SP** | **86.27%** |

82.     Combined, defendants Mederios, Blutt, Bailey, Cartt, Young, Thompson, and Farrell sold over $107 million worth of their Company stock while misleading investors about the Company's business prospects.  The following is a table showing the total insider sales that occurred during the period:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **BAILEY** | 8/25/2011 | 19,800 | $26.04 | $515,592.00 |
| | 8/25/2011 | 10,200 | $26.99 | $275,298.00 |
| | 9/12/2011 | 6,299 | $25.28 | $159,238.72 |
| | 9/12/2011 | 8,353 | $26.26 | $219,349.78 |
| | 9/12/2011 | 8,433 | $27.25 | $229,799.25 |
| | 9/12/2011 | 6,415 | $28.09 | $180,197.35 |
| | 9/12/2011 | 500 | $28.90 | $14,450.00 |
| | 10/10/2011 | 7,200 | $31.43 | $226,296.00 |
| | 10/10/2011 | 22,800 | $32.45 | $739,860.00 |
| | 11/10/2011 | 29,900 | $41.07 | $1,227,993.00 |
| | 11/10/2011 | 100 | $41.81 | $4,181.00 |
| | 12/9/2011 | 4,500 | $43.18 | $194,310.00 |
| | 12/9/2011 | 23,882 | $44.16 | $1,054,629.12 |

| | | | | |
|---|---|---|---|---|
| | 12/9/2011 | 1,618 | $44.94 | $72,712.92 |
| | 1/10/2012 | 30,000 | $41.87 | $1,256,100.00 |
| | 2/10/2012 | 12,300 | $34.59 | $425,457.00 |
| | 2/10/2012 | 17,700 | $34.97 | $618,969.00 |
| | 3/9/2012 | 18,900 | $35.31 | $667,359.00 |
| | 3/9/2012 | 10,300 | $36.17 | $372,551.00 |
| | 3/9/2012 | 800 | $36.87 | $29,496.00 |
| | 4/10/2012 | 30,000 | $40.92 | $1,227,600.00 |
| | 5/10/2012 | 15,000 | $39.65 | $594,750.00 |
| | 5/10/2012 | 15,000 | $39.66 | $594,900.00 |
| | 6/11/2012 | 15,000 | $45.37 | $680,541.00 |
| | 6/11/2012 | 15,000 | $45.37 | $680,604.00 |
| | 7/10/2012 | 3,339 | $57.89 | $193,297.38 |
| | 7/10/2012 | 11,661 | $57.71 | $672,907.33 |
| | 7/10/2012 | 15,000 | $57.61 | $864,172.50 |
| | 8/27/2012 | 20,000 | $43.07 | $861,416.00 |
| | 8/27/2012 | 20,000 | $43.07 | $861,320.00 |
| | 9/13/2012 | 28,077 | $50.08 | $1,406,042.81 |
| | 9/13/2012 | 11,923 | $50.08 | $597,143.19 |
| | | **440,000** | | **$17,718,533.35** |
| | | | | |
| **BLUTT** | 9/12/2011 | 370,000 | $26.13 | $9,668,655.00 |
| | 11/15/2011 | 150,000 | $43.94 | $6,591,000.00 |
| | 5/3/2012 | 79,952 | $43.95 | $3,513,890.40 |
| | 5/4/2012 | 11,573 | $42.69 | $494,051.37 |
| | 7/2/2012 | 70,000 | $53.11 | $3,717,980.00 |
| | 9/4/2012 | 14,730 | $47.60 | $701,148.00 |
| | 9/4/2012 | 10,000 | $47.60 | $476,000.00 |
| | | **706,255** | | **$25,162,724.77** |
| | | | | |
| **CARTT** | 5/13/2011 | 70,400 | $22.73 | $1,600,192.00 |
| | 5/16/2011 | 79,087 | $22.04 | $1,743,077.48 |
| | 8/4/2011 | 25,513 | $30.17 | $769,727.21 |
| | 8/10/2011 | 25,000 | $31.00 | $775,000.00 |
| | 8/11/2011 | 60,968 | $31.00 | $1,890,008.00 |
| | 8/11/2011 | 25,000 | $31.19 | $779,750.00 |
| | 8/15/2011 | 14,032 | $31.50 | $442,008.00 |
| | 8/15/2011 | 33,123 | $31.50 | $1,043,374.50 |
| | 10/28/2011 | 139,286 | $41.36 | $5,760,868.96 |
| | 10/31/2011 | 25,000 | $42.60 | $1,065,000.00 |
| | 11/8/2011 | 8,100 | $42.75 | $346,275.00 |
| | | **505,509** | | **$16,215,281.15** |
| | | | | |
| **FARRELL** | 11/16/2011 | 15,918 | $43.21 | $687,816.78 |
| | 11/16/2011 | 14,082 | $43.73 | $615,805.86 |
| | 4/19/2012 | 25,000 | $42.00 | $1,050,000.00 |
| | | **55,000** | | **$2,353,622.64** |
| | | | | |
| **MEDEIROS** | 4/29/2011 | 204,841 | $20.36 | $4,170,562.76 |
| | 5/2/2011 | 80,372 | $20.70 | $1,663,700.40 |
| | 5/3/2011 | 4,500 | $20.38 | $91,710.00 |

| | | | | |
|---|---|---|---|---|
| | 5/12/2011 | 115,128 | $22.07 | $2,540,874.96 |
| | 8/3/2011 | 94,500 | $31.18 | $2,946,510.00 |
| | 10/28/2011 | 147,756 | $41.55 | $6,139,261.80 |
| | 10/31/2011 | 55,221 | $42.26 | $2,333,639.46 |
| | 10/31/2011 | 7,248 | $42.65 | $309,127.20 |
| | 11/5/2011 | 180,189 | $42.57 | $7,670,645.73 |
| | 11/11/2011 | 123,036 | $42.98 | $5,288,087.28 |
| | 11/14/2011 | 50,572 | $43.99 | $2,224,662.28 |
| | | 1,063,363 | | $35,378,781.87 |
| | | | | |
| THOMPSON | 4/29/2011 | 167,500 | $20.38 | $3,413,650.00 |
| | | 167,500 | | $3,413,650.00 |
| | | | | |
| YOUNG | 8/5/2011 | 10,000 | $28.50 | $285,000.00 |
| | 8/12/2011 | 9,208 | $32.00 | $294,656.00 |
| | 8/12/2011 | 100 | $32.00 | $3,200.00 |
| | 8/15/2011 | 5,792 | $32.00 | $185,344.00 |
| | 8/15/2011 | 300 | $32.00 | $9,600.00 |
| | 10/31/2011 | 75,000 | $41.03 | $3,077,250.00 |
| | 10/31/2011 | 4,724 | $41.40 | $195,573.60 |
| | 4/27/2012 | 70,000 | $42.81 | $2,996,700.00 |
| | | 175,124 | | $7,047,323.60 |
| | | | | |
| Total: | | 3,112,751 | | $107,289,917.39 |

83.    While defendants Mederios, Blutt, Bailey, Cartt, Young, Thompson, and Farrell sold some their personally-held Company stock pursuant to 10b5-1 plans, these plans were adopted after the misconduct had already begun. As such, Mederios, Blutt, Bailey, Cartt, Young, Thompson, and Farrell knew that Questcor's stock was artificially inflated due to their improper statements when adopting the 10b5-1 plans, and cannot avail themselves of the inference that they did not trade on the material adverse, non-public information.

## DAMAGES TO QUESTCOR

84.    As a result of the Individual Defendants' improprieties, Questcor disseminated improper, public statements concerning the Company's business prospects.  These improper statements have devastated Questcor's credibility, corporate image, and goodwill as reflected by the Company's over $2.3 billion, or almost 67%, market capitalization loss after the truth was released concerning its improper marketing practices and overstated business prospects. For at least the

foreseeable future, Questcor will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Questcor's ability to raise equity capital or debt on favorable terms in the future is impaired. In addition, the Company will now likely face increased levels of scrutiny when it seeks reimbursements from the U.S. government.

85.     Further, as a direct and proximate result of the Individual Defendants' actions, Questcor has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)     costs incurred in investigating and defending Questcor and certain officers and directors in the pending Securities Class Actions;

(b)     costs incurred from paying any potential settlement or adverse judgment in the pending Securities Class Actions;

(c)     costs incurred in responding to the U.S. government investigation into the Company's promotional practices;

(d)     costs incurred from paying any potential fines to the U.S. government;

(e)     costs incurred from repurchasing almost $185 million of the Company's own stock at artificially inflated prices; and

(f)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Questcor.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

86.     Plaintiff brings this action derivatively in the right and for the benefit of Questcor to redress injuries suffered, and to be suffered, by Questcor as a direct result of the breaches of fiduciary duty, waste of corporate assets, and unjust enrichment by the Individual Defendants. Questcor is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

- 38 -

87.   Plaintiff will adequately and fairly represent the interests of Questcor in enforcing and prosecuting its rights.

88.   Plaintiff was a shareholder of Questcor at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Questcor shareholder.

89.   The current Board of Questcor consists of the following seven individuals: defendants Bailey, Thompson, Blutt, Bradsher, Farrell, Silverman, and Whitcup.  Plaintiff has not made any demand on the Board because such a demand would be a futile and useless act, particularly for the reasons stated below.

**Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid Exercise of Business Judgment**

90.   The Director Defendants' challenged misconduct at the heart of this case constitutes the direct facilitation of improper business practices, and violations of federal securities laws and regulations that threaten the Company's very survival.   As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy and model based on deliberate and widespread improper activities.   Defendants Bailey, Thompson, Blutt, Bradsher, Farrell, Silverman, and Whitcup allowed and oversaw Questcor's improper marketing of Acthar, which has exposed the Company to a U.S. government investigation into its promotional practices.  Bailey, Thompson, Blutt, Bradsher, Farrell, Silverman, and Whitcup were confronted with numerous reports about the improprieties of the Company's business practices but authorized the Company to deny the claims, and, just as importantly, continue to have the Company operate in this improper manner.  As a result of these actions, Questcor will now likely face increased levels of scrutiny when it seeks reimbursements from the U.S. government for its products.  Causing the Company to engage in improper and illegal conduct that threatens its survival is not a protected business

1  decision and such conduct can in no way be considered a valid exercise of business

2  judgment.  Accordingly, demand on the Board is excused.

3      91.  Defendants Bailey's, Thompson's, Blutt's, Bradsher's, Farrell's,

4  Silverman's, and Whitcup's authorizations to repurchase the Company's stock at

5  artificially inflated rates were not protected business decisions.  Bailey, Thompson,

6  Blutt, Bradsher, Farrell, Silverman, and Whitcup were specifically empowered

7  with the authority to limit or terminate the stock repurchase program at any time

8  without prior notice.  Despite this power, and even though Bailey, Thompson,

9  Blutt, Bradsher, Farrell, Silverman, and Whitcup knew or recklessly disregarded

10  the fact that the value of the Company was inflated due to improper statements

11  regarding Company's business prospects, these defendants directed or permitted

12  the Company to materially overpay for its own stock.  Even worse, Bailey,

13  Thompson, Blutt, Bradsher, Farrell, Silverman, and Whitcup expanded the original

14  February 2008 stock repurchase plan by an additional five million shares.

15  **Demand Is Excused Because a Majority of the Current Board Faces a**
16  **Substantial Likelihood of Liability for Their Misconduct**

17      92.  Defendants Bailey's, Thompson's, Blutt's, Bradsher's, Farrell's,

18  Silverman's, and Whitcup's multiple authorizations and repurchases of the

19  Company's stock at artificially inflated rates, and failure to limit or terminate the

20  stock repurchase program, was in breach of their fiduciary duty and resulted in

21  corporate waste.  Accordingly, Bailey, Thompson, Blutt, Bradsher, Farrell,

22  Silverman, and Whitcup face a substantial likelihood of liability for breaching their

23  fiduciary duty of loyalty and wasting corporate assets, rendering any demand upon

24  them futile.

25      93.  Defendants Blutt, Bailey, Thompson, and Farrell, constituting four of

26  the seven current members of the Board, sold Questcor stock under highly

27  suspicious circumstances.  As detailed above, Blutt, Bailey, Thompson, and

28  Farrell, as officers and/or directors of the Company, possessed material, non-public

company information and used that information to benefit themselves. These insiders sold stock based on this knowledge of material, non-public information concerning the Company's financial condition, future business prospects, and outlook. As alleged herein, Blutt, Bailey, Thompson, and Farrell's trading was suspicious in timing and amount. Blutt sold 706,255, or over 76% of his shares, for proceeds of $25,162,724.77. Bailey sold 440,000, or almost 75% of his shares, for proceeds of $17,718,533.35. Thompson sold 167,500, or over 91% of his shares, for proceeds of $3,413,650. Farrell sold 55,000, or over 86% of his shares, for proceeds of $2,353,622.64. Accordingly, Blutt, Bailey, Thompson, and Farrell face a substantial likelihood of liability for breaching their fiduciary duty of loyalty, rendering any demand upon them futile.

94.    As explained above, defendant Bailey breached his fiduciary duties by making improper statements in the Company's press releases and SEC filings regarding the Company's business prospects.

95.    Defendants Blutt, Thompson, and Farrell, as members of the Audit Committee, reviewed and approved the improper statements and misleading financial results. The Audit Committee's Charter provides that it is responsible for compliance with legal and regulatory requirements. Moreover, the Audit Committee Defendants were specifically tasked with "review[ing] and approv[ing] the Company's earnings press releases, guidance, and quarterly and annual financial statements." Thus, the Audit Committee Defendants are responsible for knowingly or recklessly allowing the improper statements regarding the Company's business prospects. Despite their knowledge, or with reckless disregard, the Audit Committee Defendants caused, and additionally in some instances signed, these improper statements. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Audit Committee

Defendants face a substantial likelihood of liability for their breach of fiduciary duties. Any demand upon them is futile.

96.     Defendants Farrell, Whitcup, and Thompson, as members of the Compliance Committee, breached their fiduciary duty of loyalty by failing to monitor the Company's compliance with "significant healthcare related" and "regulatory issues." Farrell, Whitcup, and Thompson completely and utterly failed in their duty to police the Company's compliance with "U.S. pharmaceutical product promotional rules and regulations, including with respect to … product promotional activities, unapproved product uses," as required by the Compliance Committee Charter in effect at the time. Farrell, Whitcup, and Thompson allowed and oversaw Questcor's improper marketing of Acthar for indications other than infantile spasms, which has exposed the Company to a U.S. government investigation into its promotional practices. According, any demand upon the Compliance Committee Defendants is futile.

97.     Defendants Bailey, Thompson, Blutt, Bradsher, Farrell, Silverman, and Whitcup, all seven members of the Board, breached their duty of loyalty by failing to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures.  Bailey, Thompson, Blutt, Bradsher, Farrell, Silverman, and Whitcup also failed to prevent the other Individual Defendants from committing this wrongdoing.  As a result of Bailey, Thompson, Blutt, Bradsher, Farrell, Silverman, and Whitcup's course of conduct, the Company is now the subject of the Securities Class Actions.

98.     The acts complained of constitute violations of the fiduciary duties owed by Questcor's officers and directors and these acts are incapable of ratification.

99.     Questcor has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who

1  were responsible for that wrongful conduct to attempt to recover for Questcor any
2  part of the damages Questcor suffered and will suffer thereby.

3      100.  Plaintiff has not made any demand on the other shareholders of
4  Questcor to institute this action since such demand would be a futile and useless
5  act for at least the following reasons:

6          (a)    Questcor is a publicly held company with over 59.6 million
7  shares outstanding and thousands of shareholders;

8          (b)    making demand on such a number of shareholders would be
9  impossible for plaintiff who has no way of finding out the names, addresses, or
10 phone numbers of shareholders; and

11         (c)    making demand on all shareholders would force plaintiff to
12 incur excessive expenses, assuming all shareholders could be individually
13 identified.

14                              **COUNT I**

15        **Against Individual Defendants for Breach of Fiduciary Duty**

16     101.  Plaintiff incorporates by reference and realleges each and every
17 allegation contained above, as though fully set forth herein.

18     102.  The Individual Defendants owed and owe Questcor fiduciary
19 obligations.  By reason of their fiduciary relationships, the Individual Defendants
20 owed and owe Questcor the highest obligation of good faith, fair dealing, loyalty,
21 and due care.

22     103.  Each of the Individual Defendants violated and breached their
23 fiduciary duties.  More specifically, the Individual Defendants violated their duty
24 of loyalty by creating a culture of lawlessness within Questcor, and/or consciously
25 failing to prevent to Company from engaging in the unlawful acts complained of
26 herein.

27     104.  The Officer Defendants, Bailey, Mulroy, Cartt, and Young,
28 knowingly, recklessly, or with gross negligence: (i) made improper statements in

the Company's press releases and public filings concerning the Company's business prospects, including, but not limited to, the effectiveness of, and potential market growth for, Acthar; and (ii) failed to ensure that reliable systems of financial controls and reporting were in place at the Company.  Officer Defendant Medeiros knowingly, recklessly, or with gross negligence failed to ensure that reliable systems of financial controls and reporting were in place at the Company.

105.  The Director Defendants, Bailey, Blutt, Thompson, Farrell, Bradsher, Silverman, and Whitcup, as directors of the Company, owed Questcor the highest duty of loyalty.  The Director Defendants knowingly or recklessly breached their duty of loyalty by: (i) causing Questcor to repurchase Company shares, and failing to halt the repurchases of shares, while Questcor's share price was artificially inflated as a result of improper statements regarding Questcor's business prospects; and (ii) failing to ensure that reliable systems of financial controls and reporting were in place at the Company.  The stock repurchases were made for improper purposes as alleged herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote Questcor's best interests.

106.  The Audit Committee Defendants, Blutt, Farrell, and Thompson, breached their fiduciary duty of loyalty by approving the statements described herein that were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and Blutt, Farrell, and Thompson failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

107.  The Compliance Committee Defendants, Farrell, Whitcup, and Thompson, breached their fiduciary duty of loyalty by failing to monitor the Company's compliance with "significant healthcare related" and "regulatory

1  issues."  Farrell, Whitcup, and Thompson completely and utterly failed in their
2  duty to police the Company's compliance with "U.S. pharmaceutical product
3  promotional rules and regulations, including with respect to… product promotional
4  activities, unapproved product uses."  As a result, the Company is now the subject
5  of a U.S. government investigation into its promotional practices.

6  108.  The Insider Selling Defendants, Mederios, Blutt, Bailey, Cartt,
7  Young, Thompson, and Farrell, breached their duty of loyalty by selling Questcor
8  stock on the basis of the knowledge of the improper information described above
9  before that information was revealed to the Company's shareholders.  The
10  information described above was proprietary, non-public information concerning
11  the Company's current and future business prospects.  It was a proprietary asset
12  belonging to the Company, which Mederios, Blutt, Bailey, Cartt, Young,
13  Thompson, and Farrell used for their own benefit when they sold Questcor
14  common stock.

15  109.  As a direct and proximate result of the Individual Defendants'
16  breaches of their fiduciary duties, Questcor has sustained substantial damages,
17  including direct monetary damages and damages to its reputation and goodwill in
18  the capital markets.  As a result of the misconduct alleged herein, the Individual
19  Defendants are liable to the Company.

20  110.  Plaintiff, on behalf of Questcor, has no adequate remedy at law.

21  ### COUNT II

22  **Against All Director Defendants for Waste of Corporate Assets**

23  111.  Plaintiff incorporates by reference and realleges each and every
24  allegation contained above, as though fully set forth herein.

25  112.  As a result of the misconduct described above, the Individual
26  Defendants have wasted corporate assets by failing to consider the interests of the
27  Company and its public shareholders.  The Individual Defendants failed to conduct
28  proper supervision in connection with the payment of $185 million to repurchase

1  shares of the Company's stock on the open market when the Individual Defendants

2  knew and/or consciously disregarded the fact that the stock price was artificially

3  inflated by improper statements concerning the Company's business prospects.

4      113.  Moreover, as a result of the Individual Defendants' failure to

5  implement adequate internal controls to ensure that the Company's public

6  statements and financial results were accurate, defendants made improper

7  statements in the Company's press releases and public filings.  As a result,

8  Questcor is now subject to the Securities Class Actions.  The Individual

9  Defendants have caused Questcor to waste its assets by forcing it to defend itself in

10  the ongoing litigation, in addition to any ensuing costs from a potential settlement

11  or adverse judgment.  Further, the Individual Defendants have caused Questcor to

12  waste its assets by paying improper compensation and bonuses to certain of its

13  executive officers and directors that breached their fiduciary duty.

14      114.  The Individual Defendants are liable to the Company for these acts of

15  waste.

16      115.  Plaintiff, on behalf of Questcor, has no adequate remedy at law.

17  <div align="center">**COUNT III**</div>

18  <div align="center">**Against Individual Defendants for Unjust Enrichment**</div>

19      116.  Plaintiff incorporates by reference and realleges each and every

20  allegation set forth above, as though fully set forth herein.

21      117.  By their wrongful acts and omissions, the Individual Defendants were

22  unjustly enriched at the expense of and to the detriment of Questcor.  Their unjust

23  enrichment includes, but is not limited to, compensation, bonuses, stock options

24  awards, and benefits paid to the Individual Defendants while they were breaching

25  their fiduciary duties of care, loyalty, and good faith to Questcor, and violating

26  federal and state laws.

27      118.  Moreover, the Insider Selling Defendants, Mederios, Blutt, Bailey,

28  Cartt, Young, Thompson, and Farrell, sold Questcor stock while in possession of

material adverse, non-public information that artificially inflated the price of Questcor stock. As a result, Mederios, Blutt, Bailey, Cartt, Young, Thompson, and Farrell profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

119. The Individual Defendants' unjust enrichment was directly related to the impoverishment of Questcor.

120. Plaintiff, as a shareholder and representative of Questcor, seeks restitution from these Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B. Directing Questcor to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Questcor and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

    1. a proposal to control insider selling;

    2. a proposal to strengthen the Company's disclosure controls and procedures;

    3. a proposal to ensure that Questcor prudently expends funds in stock repurchase programs;

1         4.    a proposal to implement and maintain internal controls that

2 police the Company's sales and marketing practices;

3         5.    a proposal to strengthen the firewall between the Company's

4 marketing and medical divisions  in order to avoid potential conflicts;

5         6.    a proposal to strengthen the Board's supervision of operations

6 and develop and implement procedures for greater shareholder input into the

7 policies and guidelines of the Board; and

8         7.    a provision to permit the shareholders of Questcor to nominate

9 at least three candidates for election to the Board;

10     C.    Extraordinary equitable and/or injunctive relief as permitted by law,

11 equity and state statutory provisions sued hereunder, including attaching,

12 impounding, imposing a constructive trust on or otherwise restricting defendants'

13 assets so as to assure that plaintiff on behalf of Questcor has an effective remedy;

14     D.    Awarding to Questcor restitution from defendants, and each of them,

15 and ordering disgorgement of all profits, benefits, and other compensation obtained

16 by defendants, including all ill-gotten gains from the Insider Selling Defendants;

17     E.    Awarding to plaintiff the costs and disbursements of the action,

18 including reasonable attorneys' fees, accountants' and experts' fees, costs, and

19 expenses; and

20     F.    Granting such other and further relief as the Court deems just and

21 proper.

22                          **JURY DEMAND**

23     Plaintiff demands a trial by jury.

24 Dated: October 11, 2012           ROBBINS UMEDA LLP

25                          BRIAN J. ROBBINS
                             FELIPE J. ARROYO

26                          SHANE P. SANDERS
                             KEVIN S. KIM

27

28                              BRIAN J. ROBBINS

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsumeda.com
farroyo@robbinsumeda.com
ssanders@robbinsumeda.com
kkim@robbinsumeda.com

GOLDFARB LLP
HAMILTON LINDLEY
2501 N. Harwood Street, Suite 1801
Dallas, TX 75201
Telephone: (214) 583-2257
Facsimile: (214) 583-2234
hlindley@goldfarbllp.com

Attorneys for Plaintiff

773012

- 49 -

## VERIFICATION

I, James Tripoli, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:_____10/08/2012_____

_____
JAMES TRIPOLI

775599

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Andrew Guilford and the assigned discovery Magistrate Judge is Marc Goldman.

The case number on all documents filed with the Court should read as follows:

## SACV12- 1759 AG (MLGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=======================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
Brian J. Robbins (190264)
ROBBINS UMEDA LLP
600 B Street, Suite 1900
San Diego, CA 92101

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES TRIPOLI, Derivatively on Behalf of QUESTCOR PHARMACEUTICALS, INC., <br><br><div align=right>PLAINTIFF(S)</div><br>v.<br><br>DON M. BAILEY, MICHAEL H. MULROY, STEPHEN L. CARTT, DAVID YOUNG, (See Attachment A)<br><br><div align=right>DEFENDANT(S).</div> | CASE NUMBER<br><br>**SACV12 - 01759 AG (MLGx)**<br><br><br>**SUMMONS** |

TO:    DEFENDANT(S):

        A lawsuit has been filed against you.

        Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, Brian J. Robbins _____, whose address is ROBBINS UMEDA LLP, 600 B Street, Suite 1900, San Diego, CA 92101 _____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.


Dated:    OCT 11 2012

                                Clerk, U.S. District Court

                                By:  _____
                                            *Lori Wagers*
                                            **LORI WAGERS**
                                            Deputy Clerk

                                            *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

ATTACHMENT "A" TO SUMMONS
(Defendants)


DAVID J. MEDEIROS, MITCHELL J. BLUTT, VIRGIL D. THOMPSON,
STEPHEN C. FARRELL, NEAL C. BRADSHER, LOUIS E. SILVERMAN, and
SCOTT M. WHITCUP,

<div style="text-align:center">Defendants,</div>

    -and-

QUESTCOR PHARMACEUTICALS, INC., a California corporation,

<div style="text-align:center">Nominal Defendant.</div>

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
JAMES TRIPOLI, Derivatively on Behalf of QUESTCOR PHARMACEUTICALS, INC.

**DEFENDANTS**
DON M. BAILEY, MICHAEL H. MULROY, STEPHEN L. CARTT, DAVID YOUNG, DAVID J. MEDEIROS, MITCHELL J. BLUTT, VIRGIL D. THOMPSON, STEPHEN C. FARRELL, NEAL C. BRADSHER, et al.

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
ROBBINS UMEDA LLP, 600 B Street, Suite 1900, San Diego, California 92101; (619) 525-3990

**Attorneys (If Known)**

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☒ No  ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. §1332; Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus- Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:** Case Number: **SACV12 – 01759 AG (MLGx)**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)                    CIVIL COVER SHEET                    Page 1 of 2

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑ Yes
If yes, list case number(s): 12-1623-DMG, 12-1707-DOC, 12-1708 -DOC, 12-1716-DOC, 12-1717-CJC, 12-1718-JST

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)
☑ A. Arise from the same or closely related transactions, happenings, or events; or
☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☑ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | James Tripoli, Chariton County, Missouri |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Questcor Pharmaceuticals, Inc., Don M. Bailey, Michael H. Mulroy, Louis E. Silverman, Scott M. Whitcup - Orange County | Stephen L. Cartt - San Mateo County; David J. Medeiros - Alameda County; Virgil D. Thompson - San Diego County; David Young - San Francisco County; Mitchell J. Blutt, Neal C. Bradsher - NY; Stephen C. Farrell - MA |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County |  |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____ Date October 11, 2012

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |